## Sturgill v. Chesapeake & Ohio Railway Company.

(Decided December 18, 1928.)

EDWARD L. ALLEN and A. J. MAY for appellant.

BROWNING & REED, KIRK, KIRK & WELLS and B. F. COMBS for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affiming.

Plaintiff, a passenger on defendant's passenger train No. 38, sought damages for being carried beyond his destination. The defense was that the train upon which he was riding was not scheduled to stop at that place. At the close of plaintiff's evidence, a directed verdict was returned in favor of defendant. Plaintiff appeals.

Defendant operates a line of railroad from Ashland to Pikeville, and a branch line connecting therewith at Allen and running up Beaver Creek. Plaintiff lived at Tram, a small station six miles north of Allen and about equidistant from Ivell to the south and Betsy Lane to the north. Tram was a small hamlet at which regular stops were made by certain trains, but it is not scheduled as a stop for train No. 38. On the afternoon of July 2, 1925, plaintiff and a companion bought tickets at Martin on the Beaver Creek branch for Tram and took passage on the

branch train to Allen, and, upon the arrival of train No. 38 about 8 o'clock in the evening, continued their journey on it. They presented their tickets to the conductor after the train had started from Allen. He informed them that Tram was not a stop for that train, but that he would let them off at either Ivell or Betsy Lane, and the conversation was not extended; the parties saying they thought he would stop at Tram and let them off anyway. However, it did not stop at that place, and they were carried on to Betsy Lane, where they alighted. It was raining hard, and they walked back to Tram, a distance of two miles, being thoroughly drenched. Plaintiff testifies that he contracted a severe cold, almost had pneumonia, but had no physician and had fully recovered at the time of the trial. It is admitted that Tram is not a scheduled stop for train No. 38, but insisted that this regulation had been habitually violated by the company and thereby had been abrogated or waived. It is not claimed that train No. 38 was ever stopped to take on passengers at that place by flag or otherwise, but there is evidence that is has stopped to let off passengers having tickets calling for that station. As to this plaintiff testifies:

"Q. Tell the jury whether or not that particular train at that time had been stopping at Tram station? A. Yes, sir.

"Q. If it had stopped at Tram station on its regular night runs, if you know of any times around just then, or if it stopped at Tram station tell the jury about it. A. It had stopped occasionally along and let people off at Tram Station.

"Q. Now you say it was the custom for the train to stop there? (Obj.) A. Yes, sir.

"Q. You had seen it stop there prior to this? A. Yes, sir."

On cross-examination he practically admitted that he knew Tram was not a scheduled stop for the train, and testified:

"Q. Do you know it to stop for everybody that had tickets for Tram? A. I don't know nothing about that.

"Q. You just know that you saw people get off there occasionally? A. Yes, sir, at different times."

Sherman Hunt testified that he lived at Tram; had ridden on this train and been let off of it on two occasions about eight months previously; and that he had seen it stop to let off a bunch of colored people. He further testified that it stops all of the time when there is any one to get off.

Joe Stanley, the companion of plaintiff on the trip, corroborates his statement as to what occurred, and in reference to the custom testified: ''Well, the train very often stopped to let passengers off at night.'' He knew No. 38 was not scheduled to stop at that station at the time he purchased his ticket, but stated he ''had seen that train stop occasionally and let pasengers off.'' In reference to the conversation with the conductor, he was asked:

''Q. You decided, you and Mr. Sturgill, to go on to Betsy Lane. A. No, we didn't decide to go on to Betsy Lane; we thought probably he would put us off at Tram; we took our chances on it.

''Q. You took chances on the conductor stopping anyway after he had told you? A. Yes, sir.

''Q. You had ridden this train before and been carried on to Ivell and got off at Ivell and walked up to Tram A. No, I usually got off at Betsy Lane.''

The rule to be applied to cases of this character is: ''The railroad company has a right to make reasonable rules and regulations in the conduct of its business. It has a right to place a train upon its road and designate in its schedule the station where it will receive and discharge passengers. It is the duty of the holder of a ticket or one who desires to become a passenger on the train to ascertain before boarding it that it stops at the station to which he desires to go. If it be within the power of the passenger by getting aboard the train to compel it to stop at any station he may designate, then the authority of the company to make reasonable rules for the conduct of its business and the running of its trains is destroyed. The traveling public would be seriously interrupted. The railroad could no longer calculate on its trains making certain connections with trains on other roads and the hazard of operating them would be greatly increased. To give the power to an individual to thus operate the train to have it stopped at any station that would serve the convenience of one, but

while his convenience was served may be an inconvenience to many others on board the train would be seriously interfered with." L. N. R. Co. v. Miles, 100 Ky. 84, 37 S. W. 486; L. & N. R. R. v. Gaddie, 162 Ky. 205, 172 S. W. 514, L. R. A. 1915D, 705; Hancock v. L. & N. R. R. Co., 85 S. W. 210, 27 Ky. Law Rep. 434.

Appellant concedes the general rule to be as above stated, but claims that the facts of this case show the schedule was ignored, and that in purchasing his ticket for Tram he could rely on a custom of defendant in stopping this particular train to permit passengers having tickets to alight at that point. Reliance is had on Ballard v. Cincinnati R. Co., 15 Ky. Law Rep. 703, wherein we said:

"In the absence of any express contract to the contrary a railroad company is not bound to stop its train to take on or discharge passengers at a station where under reasonable rules of the company (it) does not stop; nor does the fact that the train is sometimes stopped for the accommodation of persons desiring to get on or off confer upon persons the right to require it. But it is the duty of" the "company to stop its trains at way-stations where it advertises to or is accustomed to stop, in order that persons may get on or off."

Assuming the correctness of the latter rule, it is clear that the facts in this case do not measure up to the standard there adopted. A custom in derogation of a reasonable rule regulating the movement of trains is not established by evidence of a few sporadic or isolated instances in which the conductor may have acted under special orders or in violation of rules. But, on the contrary, the evidence should show the conduct relied on to have been general, and to have continued for such a length of time as to raise an inference that such acts were known to the officers of the company and approved or assented to by them. 27 R. C. L. 197; Barry v. Hannibal & St. J. R. Co., 98 Mo. 62, 11 S. W. 308, 14 Am. St. Rep. 610; St. Louis, Iron Mountain & Southern Ry. Co. v. Jones, 96 Ark. 558, 132 S. W. 636, 37 L. R. A. (N.S.) 418; cf. Shortsleeves v. Capital Traction Co., 28 App. D. C. 365, 8 L. R. A. (N. S.) 287.

Here it is admitted that the parties knew this was not a scheduled stop. They made no inquiry at Allen as to whether it would stop for them. Upon presenting their

ticket to the conductor, he informed them it would not stop at that place and that they would have to alight at either Ivell or Betsy Lane. Upon being so informed, they did not ask that the train be stopped for them to get off nor make further objection. They say they thought they would take a chance. When analyzed, the alleged custom upon which they depend is that the train occasionally stopped at Tram and that they had been permitted to alight there on a few occasions. Stanley states he was accustomed to riding on the train and getting off at Betsy Lane. Hunt's testimony is that he had gotten off twice and had seen the train stop at other times. It is far from showing that the train had stopped at that station to let off passengers with sufficient regularity and for such a length of time as to raise an inference that the officers of the company approved or assented to it so stopping.

Wherefore, perceiving no error, the judgment is affirmed.